**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| New Grange, Inc., *et al.*, | |
| Plaintiffs, | |
| v. | Civil No.: 08-916 JMR/FLN |
| The Melting Pot Restaurants, Inc., | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR TEMPORARY INJUNCTION**

**INTRODUCTION**

Defendant The Melting Pot Restaurants, Inc. ("TMPRI") opposes Plaintiffs'

motion for temporary[*sic*] injunction, which supposedly seeks only to compel TMPRI to

"duly consider and review" Plaintiffs' franchise application.  But TMPRI has twice duly

considered, reviewed, and declined Plaintiffs' application.  Still dissatisfied, Plaintiffs

move the Court to enter a mandatory injunction to require TMPRI to review their

application a *third* time, so as to cripple TMPRI's Minnesota franchise licensing

business.  Plaintiffs have no likelihood of success on the merits of their claims, nor have

they suffered *any* injury because of TMPRI's legitimate actions.  For these reasons, the

Court should deny Plaintiffs' motion and compel mediation.

But the Court need not even consider Plaintiffs' injunctive relief demand because

the parties' arbitration agreement precludes Plaintiffs' demand in this forum.  The

franchise license agreement on which Plaintiffs' claims are based ("Franchise License")

contains a valid arbitration provision, encompassing all of Plaintiffs' claims.[1]  To

consider injunctive relief, the Court must delve into the merits of Plaintiffs' claims—a

task reserved to an arbitrator.  Because the Franchise License contains no provision

permitting the Court to enter injunctive relief without analyzing the merits, Plaintiffs

must instead bring their claims exclusively in arbitration.[2]  A provision that allows a

party to seek injunctive relief or specific performance "in a court of competent

jurisdiction" does not change that result.[3]

In addition, David Ahern, Brian Jaedike, and Cuchulainn, Inc. are not MELTING

POT® franchisees[4] and so have no legal standing to assert any claim based upon New

Grange, Inc.'s Franchise License.[5]  These Plaintiffs similarly have no legal standing

based upon the Minnesota Franchise Act, as that statute protects only franchisees.

---

[1]    *See* Pls.' Compl. Ex. A; Affidavit of Kelly Jaedike ("Jaedike Aff.") ¶ 19.A; Affidavit of Richard Sveum ("Sveum. Aff.") Ex. 1 ¶ 19.A.

[2]    *See Eco Water Sys., LLC v. KRIS, Inc.*, Civ. No. 06-3105 (DSD/JJG), 2007 WL 1321851, at *1, *3-*5 (D. Minn. May 4, 2007), attached at Braunschweig Aff. Ex. 1.

[3]    *Id.  See also Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Hovey,* 726 F.2d 1286, 1292 (8th Cir. 1984) (where FAA applied and agreement did *not* allow court to enter injunctive relief without determining merits of underlying claims, district court erred in granting injunctive relief).

[4]    Sveum Aff. ¶17, Exs.1-2; Compl. ¶¶ 9-10; K. Jaedike Aff. ¶¶ 4-5.  *See also* Minn. Stat. § 80C.01(4)-(5) (defining "franchise" and "franchisee" for purposes of the MFA).

[5]    *Bores v. Domino's Pizza, LLC*, 489 F. Supp. 2d 940, 944-45 (individual owners of corporate franchisee entities lacked standing to sue for breach and claims under the MFA); *D.B. Indy, L.L.C.  v. Talisman Brookdale LLC*, Civ. No. 04-1023 (PAM/JSM), 2004 U.S. Dist. LEXIS 13834, *9 (D. Minn. July 20, 2004) (plaintiff must demonstrate injury in fact, traceable to defendant, that a favorable judgment will redress; plaintiff must also assert its own interests, not those of third-parties), Brausnchweig Aff. Ex. 2.

In light of these preclusive legal issues, the Court need not consider Plaintiffs'

motion.  But even if it does, examining Plaintiffs' record according to the *Dataphase*[6]

factors only confirms that Plaintiffs have not made the required showing for

extraordinary relief—particularly the showing necessary to obtain mandatory injunctive

relief.  Plaintiffs should be denied a mandatory injunction, as they should not be

permitted to force TMPRI to stop its Minnesota business altogether simply to extort a

second MELTING POT® franchise license.

## BACKGROUND FACTS

### I.      TMPRI'S BUSINESS AND LICENSEE SELECTION.

TMPRI has developed certain specialty restaurants, known as THE MELTING

POT® or MELTING POT® Restaurants that serve dinner only.  MELTING POT®

Restaurants are operated under certain trade names, service marks, logos, trade dress, and

other commercial symbols, including the "THE MELTING POT®" trade name and

service mark.  MELTING POT® Restaurants are operated pursuant to formats,

specifications, standards, methods, and procedures prescribed or approved by TMPRI.[7]

TMPRI's principal business is licensing others to operate MELTING POT®

restaurants but then only pursuant to the terms of written franchise license agreements.

At present, franchise licensees operate 126 MELTING POT® restaurants and are in

process to open 36 more in various locations across the United States.  TMPRI is

---

[6]     *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

[7]     Sveum Aff. ¶ 2.

registered as a franchisor with the Minnesota Commissioner of Commerce, in accordance with Minn. Statutes Chapter 80C and Minnesota Rules Chapter 2880.[8]

As TMPRI's core business is licensing others to operate MELTING POT® restaurants, TMPRI identifies general market areas across the United States in which a MELTING POT® restaurant may be well received.  Long ago, TMPRI identified the Minneapolis/St. Paul metropolitan area as one likely successful market area.  TMPRI disclosed that favorable market area to qualified licensees, among others, so that a qualified licensee may choose to locate a MELTING POT® restaurant in the Minneapolis/St. Paul area.[9]

TMPRI provides potential MELTING POT® franchise licensee candidates substantial and detailed information concerning the financial, operation, and other requirements to successfully open and operate a MELTING POT® restaurant.  For example, when a potential candidate first notifies TMPRI of its intention to become a MELTING POT® franchise licensee, TMPRI provides that candidate with TMPRI's Uniform Franchise Offering Circular ("UFOC"), which includes an example of the written franchise license agreement that a candidate must sign to become a MELTING POT® franchise licensee.[10]

---

[8]   *Id.* ¶¶ 3, 5.

[9]   *Id.* ¶ 4.

[10]   *Id.* ¶ 6.

Before becoming a MELTING POT® franchise licensee, a candidate must undergo an evaluation and qualification process. All candidates complete detailed TMPRI-specific applications, supplementing those applications with background, experience, and financial information. TMPRI examines that data to identify, select, and educate qualified applicants. After completing the screening process, TMPRI may approve a candidate as potential franchisees for a specific geographic market area.[11]

Finally, to actually become a MELTING POT® franchise licensee, a candidate must sign and deliver to TMPRI a franchise license agreement and related documents, pay to TMPRI a $35,000 initial franchise fee, and complete initial training, among other things. TMPRI's standard franchise license agreement makes this requirement clear:

> **No franchise shall be deemed to have been granted by the COMPANY to FRANCHISEE and no agreement shall be deemed to have been reached between the COMPANY and the FRANCHISEE until the COMPANY has delivered a fully executed copy of this License to FRANCHISEE and the Initial Franchise Fee has been received by the COMPANY.**[12]

TMPRI selects only franchise licensees, not restaurant locations. TMPRI may offer assistance to an approved franchise licensee to evaluate potential restaurant locations and to negotiate favorable lease terms. But a franchise licensee is free to select any location within its exclusive market area that is acceptable to TMPRI. Put another way, TMPRI does not require a franchise licensee to select a specific location, nor does TMPRI prohibit a franchise licensee from selecting a specific location within that

---

[11] *Id.* ¶ 7.

[12] *Id.* ¶ 8 (emphasis supplied).

franchise licensee's protected market area.[13]

From time to time, an existing franchise licensee may express interest in opening a MELTING POT® restaurant at a location outside its protected territory.  That licensee must manage its existing restaurant up to TMPRI's exacting standards over a lengthy evaluation period to obtain TMPRI's "Growth Ready Certification."  Growth Ready Certification, however, only begins the application, evaluation, and qualification process to open a restaurant in a new market area.  To progress from that point, an existing licensee must execute and deliver to TMPRI a detailed application, supported with detailed financial information, to prove the licensee's ability to complete a costly build-out and restaurant opening process.[14]

TMPRI analyzes all of the information the existing licensee submits, using the same or similar criteria applied to every other confidential franchise application.  If the existing licensee's application is approved, TMPRI publishes an "Approved Application Notification" on TMPRI's extranet computer network.  From that publication, other existing franchise licensees may express interest in opening a THE MELTING POT® restaurant in that same geographic location.  The competing franchise licensee must submit a completed confidential franchise application and supply the same financial, background, and related information as the original applicant.  TMPRI examines each application on its own merits, but according to the same or similar criteria, using

---

[13] *Id.* ¶ 9.

[14] *Id.* ¶ 11.

TMPRI's business judgment.  TMPRI may approve one of the applicants, or reject them both if neither meets TMPRI's expansion criteria.[15]

TMPRI's purpose in posting the Approved Application Notification is to give all existing franchise licensees an equal chance to apply for an additional franchise outside of their current markets.  TMPRI does not post the notice as an open offer to existing franchisees to accept and be immediately granted a franchise license.  Rather, all existing franchise licensees know in advance of TMPRI's qualification and approval process.[16]

## II.  NEW GRANGE AS MELTING POT® FRANCHISE LICENSEE.

Plaintiff New Grange became a MELTING POT® franchise licensee on April 24, 2007, when it assumed the existing Franchise License from another entity.[17]  The Franchise License describes and limits the rights that TMPRI granted New Grange to operate a single MELTING POT® restaurant within a limited geographic market area.  For example, TMPRI licensed New Grange to operate a single MELTING POT® restaurant in an exclusive territory that encompasses downtown Minneapolis and the geographic area encompassed by a 5-mile radius circle.  New Grange's exclusive territory does *not* encompass Woodbury, Minnesota.[18]

---

[15]  *Id*. ¶ 12.

[16]  *Id*. ¶ 13.

[17]  *Id*. ¶ 14, Exs. 1-2.

[18]  Sveum Aff. ¶ 15, Ex. 1 ¶ 2.C.

At Franchise License ¶ 2.C., TMPRI retained "**the sole right, in its sole discretion and without granting any rights to FRANCHISEE:  a) to develop, own, or to grant other persons to develop, own and operate, MELTING POT® Restaurants at such locations outside the Territory and on such terms and conditions as the COMPANY deems appropriate.**"[19]

## III.  PLAINTIFFS REFUSE TO COMPLY WITH TMPRI'S REASONABLE PRACTICES.

In June 2007, New Grange employee Kelly Jaedike (wife to Plaintiff Jaedike) informed TMPRI that New Grange hoped to immediately open a second MELTING POT® restaurant outside of its existing territory.  Consistent with TMPRI's standard practice, TMPRI evaluated New Grange's current restaurant operations, only to find that New Grange was not qualified to receive Growth Ready Certification.  To assist Plaintiffs in achieving their desire to grow, TMPRI described the deficiencies and developed an action plan for New Grange to eventually obtain Growth Ready Certification.

With TMPRI's substantial direction and assistance, New Grange eventually obtained Growth Ready Certification.  To facilitate the franchise license qualification process, TMPRI requested that New Grange submit a completed application, supported with detailed financial and related information required of every potential franchise licensee.  Rather than continue with the qualification process, New Grange focused on selecting a location for the intended restaurant and meeting with banks.[20]

---

[19]    Sveum Aff. ¶¶ 10, 16, Ex. 1 ¶ 2.C (emphasis supplied).

[20]    Sveum Aff. ¶¶ 18-19.

In late August 2007, TMPRI supplied Plaintiffs Ahern and Jaedike with a current TMPRI UFOC.  TMPRI also requested that Ahern and Jaedike sign written receipts for the UFOCs they received and return those receipts immediately to TMPRI.[21]

In September 2007, an existing (and separate from Plaintiffs) MELTING POT® franchise licensee (the "Internal Candidate") expressed an interest in developing a MELTING POT® restaurant in the Minneapolis/St. Paul area but outside New Grange's protected territory.  Because of TMPRI's desires to grow in the Minneapolis/St. Paul market with Plaintiffs, the existing and separate MELTING POT® franchise licensee was informed of Plaintiffs' intentions to complete their application and was put on hold.[22]

Through September 2007, *not one* of the Plaintiffs—including New Grange—submitted a confidential franchise application or provided the required financial information to begin to evaluate any of them for a potential franchise license.  So, on October 4, 2007, TMPRI again delivered to Ahern, Jaedike, and New Grange requests for specific financial information and the forms to report that information.  Given Plaintiffs' stated urgency to open a second MELTING POT® restaurant in the Minneapolis area, TMPRI requested the financial information by October 15, 2007, so that TMPRI could begin its examination and evaluation process.[23]

---

[21] *Id.* ¶ 20.

[22] *Id.* ¶ 21.

[23] *Id.* ¶ 22.

Rather than provide the information and cooperate in TMPRI's evaluation process, Ahern, Jaedike, and New Grange stated that they intended to first negotiate with lenders and secure a specific location.  TMPRI renewed its request for financial information on October 9, 2007, explaining that the required information was a key component of the growth evaluation process and that neither a location nor a firm commitment from a lender was to be considered at that time.  TMPRI also described how TMPRI intended to use specific information in the evaluation process.[24]

On October 16, 2007, TMPRI's leadership telephoned New Grange employee Kelly Jaedike (whom Ahern, Jaedike, and New Grange had identified as their business representative).  TMPRI requested that Ahern, Jaedike, and New Grange provide the financial information, explaining that TMPRI could not continue the evaluation process without the information.  Kelly Jaedike promised to provide all of the financial information the *next day* via overnight mail.  She sent nothing.[25]

TMPRI renewed its request for financial information to Kelly Jaedike on October 23 and October 31, 2007, via email, and again on November 5, 2007, via voice message.  Still, Ahern, Jaedike, and New Grange provided nothing.[26]

---

[24] *Id.* ¶ 23.

[25] *Id.* ¶ 24.

[26] *Id.* ¶ 25.

Because Ahern, Jaedike, and New Grange did not produce the information after so many requests, TMPRI wrote to Kelly Jaedike on November 9, 2007, to confirm TMPRI's impression that Plaintiffs did not intend to move forward. TMPRI asked whether Plaintiffs were in the position to move forward and explained that Ahern, Jaedike, and New Grange had no preemptive rights concerning a location in Woodbury, Minnesota. In addition, Plaintiffs were informed that the territory was still available to any qualified candidate. Kelly Jaedike responded to TMPRI's request on November 9, 2007, again saying she was working on the requested financial information.[27]

Because Kelly Jaedike did not provide the financial information during November and most of December 2007, TMPRI telephoned Kelly Jaedike before Christmas to see whether Ahern, Jaedike, and New Grange had any further interest in opening a second MELTING POT® restaurant outside of New Grange's protected territory. A TMPRI officer left a voice message for Kelly Jaedike because she did not answer the call.[28]

On December 27, 2007, Kelly Jaedike informed TMPRI (again) that Ahern, Jaedike, and New Grange "were working diligently to get our financial package put together and sent to you." TMPRI responded by saying TMPRI would consider that financial information when supplied but confirmed that TMPRI had *not* approved Plaintiffs' request for expansion or a specific restaurant location. TMPRI then cautioned

---

[27]   *Id.* ¶ 26, Ex. 3.

[28]   Sveum Aff. ¶ 27.

Kelly Jaedike not to proceed in finalizing a lease without an executed franchise license.[29]

Still, no financial information came from Kelly Jaedike, Ahern, Jaedike, or New Grange. So, on January 15, 2008, TMPRI wrote to Kelly Jaedike to again confirm that Woodbury, Minnesota was open to any qualified MELTING POT® franchise candidate. Because Kelly Jaedike had falsely represented to a potential landlord that TMPRI had granted her a franchise, TMPRI also instructed her to stop negotiating with that landlord. As Kelly Jaedike, Ahern, Jaedike, and New Grange all consistently refused to provide financial information or to participate in TMPRI's required application process, TMPRI informed Kelly Jaedike that TMPRI would not consider New Grange for expansion.[30]

As TMPRI received no response from Kelly Jaedike to its January 15, 2008 letter, TMPRI wrote to her again on January 31, 2008, to specifically confirm that the request for a second MELTING POT® restaurant franchise license—presumably to locate a restaurant in Woodbury—had been denied.[31]

As TMPRI was legitimately eager to move development of more MELTING POT® restaurants in Minnesota forward, particularly after waiting for Plaintiffs for almost 6 months, it notified the Internal Candidate (originally placed on hold in September 2007) that the Minneapolis/St. Paul metro area market was open for

---

[29] *Id.* ¶ 28, Ex. 4.

[30] Sveum Aff. ¶ 29, Ex. 5.

[31] Sveum Aff. ¶ 30, Ex. 6.

expansion.  Consistent with standard practice, TMPRI examined that Internal Candidate's existing business operations to identify, and propose solutions to, any barriers to Growth Ready Certification.[32]

TMPRI proceeded to grant the Internal Candidate Growth Ready Certification, so that the Internal Candidate could pursue a franchise license to operate a MELTING POT® restaurant in the Minneapolis/St. Paul metro area, but outside of New Grange's protected territory.  The Internal Candidate traveled to Minneapolis in mid-February 2008, to identify potential locations for its intended expansion.  The Internal Candidate scouted the Minneapolis/St. Paul metro area including the Woodbury market and looked at the location that Kelly Jaedike claimed she first found.[33]

On February 18, 2008, Kelly Jaedike complained, via email, that she had not been informed of another existing franchisee's intention to consider Woodbury as a potential location for a new MELTING POT® restaurant.  Kelly Jaedike also "understood" that she had some "first right to develop in our market," although New Grange's Franchise License specifically reserves all rights to establish new MELTING POT® restaurants outside of New Grange's protected territory to TMPRI.  TMPRI replied to Kelly Jaedike's email message, confirming that neither she nor any of the Plaintiffs ever had any first right of refusal concerning the Minneapolis market.  TMPRI again reminded Mrs. Jaedike that because she (and the Plaintiffs) refused to supply financial information

---

[32] *Id.* ¶ 31.

[33] *Id.* ¶ 32.

and participate in TMPRI's standard application and qualification process, New Grange had no rights except to its existing protected territory.[34]

TMPRI never told Kelly Jaedike that its letters or any of its business practices were "mere formalities" or that Plaintiffs should "continue to pursue financing and leasing arrangements for expansion" into the Woodbury market, or otherwise.[35]

On February 20, 2008, Kelly Jaedkie sent to TMPRI Plaintiffs' confidential franchise application with some supporting financial information.  This was the first application received from Plaintiffs and was delivered only after TMPRI denied Plaintiffs' requests to locate a second MELTING POT® restaurant in Minnesota.  With that application, Plaintiffs finally returned the UFOC receipts that they were given in August 2007 (and asked to sign and to return immediately).  These, too, came only after TMPRI denied Plaintiffs' expansion requests.[36]

Via email on February 28, 2008, pretending that TMPRI had not rejected Plaintiffs' expansion demands, Kelly Jaedike inquired to "see where we stand with moving forward on our request for an ADA and the Woodbury project" proclaiming that "Everyone is ready to start the next phase."  She said in her email that she "did not understand why we would need any further evaluation process" and stated, "we have

---

[34]   Sveum Aff. ¶ 33, Ex. 7.

[35]   Sveum Aff. ¶ 34.

[36]   *Id.* ¶ 35.

fulfilled our responsibilities and are ready to move forward."  For at least the *fifth* time, TMPRI explained that Kelly Jaedike and Plaintiffs had ignored TMPRI's requests for financial information and its application process.[37]

Despite TMPRI's prior rejections of Plaintiffs' unsupported expansion demands, TMPRI reviewed the application package and supporting material that Kelly Jaedike submitted on February 20, 2008.  TMPRI considered the application and after deliberation, denied the application.[38]

TMPRI continued business in the ordinary course to qualify the Internal Candidate for a license to open a MELTING POT® restaurant in the Minneapolis/St. Paul metro area.  Once qualified, and consistent with TMPRI's practice, TMPRI posted an "Approved Application Notification" for the Internal Candidate on TMPRI's extranet computer network on March 11, 2008.  The notification identifies the potential licensee as an "Internal Candidate" and describes the Market as "Minneapolis/St. Paul MN DMA."  The notification directs any strongly interested existing franchise licensee to contact TMPRI's Director of Franchise Sales, Dan Stone, to make their interest in the market known and to do so within a 2-week window—or before March 25, 2008.[39]

---

[37]  *Id.* ¶ 36, Ex. 8.

[38]  Sveum Aff. ¶ 37.

[39]  Sveum Aff. ¶ 38, Ex. 9.

During its entire relationship with New Grange, TMPRI did not ignore any of its own policies or any "agreement" with Plaintiffs, particularly because it had only one agreement, the Franchise License, with only one of the Plaintiffs—New Grange.

Although TMPRI previously notified Kelly Jaedike and Plaintiffs, on multiple occasions, that their requests to expand into the Woodbury market had been denied, on March 20, 2008, Kelly Jaedike faxed to TMPRI a purportedly completed confidential franchise application with some financial information and other materials.

Although not obligated to take any action because of Plaintiffs' belated application, TMPRI considered that application, consistent with its business practice and using its better business judgment. TMPRI considered, discussed and deliberated on Plaintiffs' belated application. Then, TMPRI rejected Plaintiffs' application.[40]

## IV.   THE LIKELY RESULT OF A THIRD APPLICATION REVIEW.

If forced to consider, discuss and deliberate on Plaintiffs' application, even at this late date, TMPRI would consider the application on its own merits according to TMPRI's qualification criteria—just as it considers every other confidential franchise application. In short, TMPRI would do exactly the same thing it did to evaluate Plaintiffs' applications that it did in February and March, 2008. If due consideration of Plaintiffs' belated application is all that Plaintiffs ask in this case, TMPRI has already provided that due consideration.[41]

---

[40]   Sveum Aff. ¶¶ 39-41.

[41]   *Id.* ¶42.

## ARGUMENT

## I.      STANDARD FOR INJUNCTIVE RELIEF.

A preliminary injunction is an extraordinary remedy, and the party seeking preliminary relief bears the burden of establishing all of the *Dataphase* factors.[42]   A movant's burdens of proof and persuasion are extraordinarily high where, as here, the movant seeks a mandatory injunction—not to preserve the *status quo*, but to turn back the clock and to obtain the same relief they would obtain if successful in arbitration.[43]

Although all four Dataphase factors are important, actual *proof* of irreparable injury is indispensable and failure to show irreparable injury is an "independent ground upon which to deny a preliminary injunction."[44]   Similarly, actual proof of a *substantial* likelihood of success on the merits is critical, particularly where there is little showing of irreparable harm.[45]   Ultimately, the Court must decide whether the balance of equities so favors Plaintiffs that it must intervene to compel TMPRI to do again that which is has *twice* done before—review and consider Plaintiffs' second untimely franchise license application.

---

[42]   *Watkins Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir. 2003) (citation omitted).

[43]   *See Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 486 (8th Cir. 1993); *Heckler v. Lopez,* 463 U.S. 1328 , 1333-34 (1983) (citing *Morrison v. Work*, 266 U.S. 481, 490 (1925) (Unlike usual "prohibitory" injunction that merely freezes the positions of the parties until the court can hear the case on the merits, mandatory injunction "like a mandamus, is an extraordinary remedial process which is granted, not as a matter of right but in the exercise of a sound judicial discretion.")

[44]   *See Adam-Mellang v. Apt. Search, Inc*., 96 F.3d 297, 299 (8th. Cir. 1996).

[45]   *See Dataphase*, 640 F.2d at 113.

In short, while paying lip service to arbitration, Plaintiffs must persuade the Court to turn back time, to disturb the *status quo* and to force TMPRI to give Plaintiffs a restaurant franchise to which they are not entitled.  Plaintiffs cannot meet *any* of the essential *Dataphase* elements*, let alone *each* of them.  For these reasons, Plaintiffs' motion for injunctive relief should be denied.

## II.   PLAINTIFFS CANNOT SATISFY THE *DATAPHASE* FACTORS.

### A.   No Irreparable Injury.

Plaintiffs have not and will not suffer any legal injury—irreparable or otherwise—by TMPRI's performance as a franchisor.  No Plaintiff has *any* legal right to a MELTING POT® franchise license outside of New Grange's protected territory under its Franchise License, as TMPRI reserved:

> "the *sole right*, in *its sole discretion* and without granting *any rights* to FRANCHISEE:  a) to develop, own, or to grant other persons to develop, own and operate, MELTING POT® Restaurants at such locations outside the Territory and on such terms and conditions *as the COMPANY deems appropriate*."[46]

No Plaintiff created some prescriptive right to a new MELTING POT® restaurant franchise license for a specific Woodbury location because he or she "saw it first," performed well according to TMPRI's business systems in a competition-free market, or simply ignored TMPRI's requests for information and its candidate qualification process.

---

[46]   Sveum Aff. Ex. 1 ¶ 2.C. (emphasis supplied).

New Grange's Franchise License is not in peril of termination and its business is not in danger of disruption. From TMPRI's standpoint, New Grange is safe in its leased real property, and Plaintiffs are free to use the Woodbury location as they choose if they actually lease that property. Being required to compete with another Melting Pot® restaurant—outside of New Grange's protected territory—is not irreparable injury as a matter of Minnesota law.[47]

Similarly, Plaintiffs face no loss of "reputation" and "good will" "when it is discovered that Plaintiffs are not the franchisees of the Melting Pot[®] in Woodbury" because no customer has any legitimate reason to expect New Grange—the only Melting Pot® franchise licensee among Plaintiffs—*would be* the operator of every Melting Pot® restaurant in Minnesota. This is particularly true where not even New Grange has any such legitimate expectation, because its Franchise License clearly provides otherwise. Finally, Minnesota courts do not recognize "customer wonder" as irreparable injury, particularly where Plaintiffs have not identified a single customer that would choose to no longer patronize New Grange's location if he or she "found out" the truth.[48]

Minn. Stat. § 80C.14(1), the provision on which Plaintiffs rely, offers Plaintiffs no

---

[47] *See Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 738 (8th Cir. 1989)(requiring terminated distributor to compete with former supplier, in the same territory and for the same customers, following termination of a distribution agreement).

[48] *Watkins Inc. v. Lewis*, 346 F.3d 841 (8th Cir. 2003)(terminated distributor's identification of a single lost customer and description of customer calls as to "what is going on" are not irreparable injury); *Feed Mgmt. Sys., Inc. v. Brill,* Civ. No. 06-4126 (MJD/SRN), 2008 U.S. Dist. LEXIS 2047 (D. Minn. Jan. 8, 2008) (terminated distributor's claimed inability to service its existing and potential customers is not irreparable injury), attached at Braunschweig Aff. Ex. 3.

solace, as the presumption of irreparable injury does not apply here.

> A violation of this section is enjoinable by a court of competent
> jurisdiction. Irreparable harm to the franchisee will be presumed if
> there is *a violation of this* section by a person who is required to
> register under section 80C.02 but *who fails to do so.*[49]

TMPRI is a franchisor, registered with the Minnesota Commissioner of Commerce.

Moreover, Plaintiffs have not shown any violation of Section 80C.14(1).  By the express

terms of the statute, Plaintiffs are not entitled to any irreparable injury presumption, nor

may they get by on a "merely likelihood" that they may somehow succeed at arbitration.

### B.      No Likelihood of Success on the Merits.

Plaintiffs Ahern, Jaedike and Cuchulainn have no contract with TMPRI, written or

oral.  They similarly have no legal right under the Minnesota Franchise Act for

"discrimination among franchisees".  Clearly, these Plaintiffs have no likelihood of

succeeding on the claims they attempt to raise.

New Grange suffers a similar fate.  The only contract that New Grange has with

TMPRI is the Franchise License.  That Franchise License does not contain any of the

"obligations" Plaintiffs hope to imply in their Complaint so as to manufacture a

preemptive  right to own a second Melting Pot[®] franchise outside of New Grange's

protected downtown Minneapolis territory.[50]  For example, New Grange's Franchise

License contains no obligation to "allow Plaintiffs to identify site locations for growth of

their Melting Pot[®] franchise."  New Grange, Inc. has only one Melting Pot[®]

---

[49]    Minn. Stat. § 80C.14(1) (emphasis supplied).

[50]    *Compare* Compl. ¶61 *with* Compl. Ex. A; Jaedike Aff. Ex. A; Sveum Aff. Ex. 1.

franchise license, and it has no legal right to expand beyond the Minneapolis metro area, not to Woodbury.  Similarly, TMPRI assumed no obligation to "allow Plaintiffs a reasonable time to negotiate a lease and obtain financing for expansion.  .  .".  New Grange had obtained a lease and financing years before for its sole franchise license, and has no prescriptive right to do anything outside of its protected territory.

The same is true of Plaintiffs' manufactured "obligations" for TMPRI to "allow Plaintiffs to set up a new business entity to operate a *new* Melting Pot[®] franchise," to "allow Plaintiffs a reasonable time to complete a Confidential Franchise Application for the expansion of their Melting Pot[®] franchise" or to "consider Plaintiffs' Confidential Franchise Application in a reasonable, good faith and non-discriminatory manner.  .  .".  The Franchise License does not confer these "rights" on New Grange (the only franchise licensee) or on the remaining Plaintiffs—complete strangers to the Franchise License.[51]

Further, the Franchise License does not confer upon New Grange (or any of the other Plaintiffs) any contract "that in the event an external candidate expressed an interest in establishing a Melting Pot [®] franchise in Plaintiffs' franchise area, Defendant would put a hold on that external candidate's application while it considered and reviewed Plaintiffs' application for expansion of their Melting Pot [®] franchise .  .  ."  Again, only New Grange has any rights under the Franchise License (which controls a franchise licensees relationship to TMPRI), and because the remaining Plaintiffs have no rights at

---

[51]  *Bores v. Domino's Pizza, LLC*, 489 F. Supp. 2d 940, 945-46 (D. Minn. 2007).

all under the License Agreement, they cannot conjure up some mythical contract.[52]

According to Plaintiffs' Complaint, Exhibit E, the "Approved Application Notification" somehow proves that Plaintiffs had an inexhaustible right to continue sending in franchise license applications and to preclude an "Internal Candidate" from obtaining a MELTING POT® franchise license to operate a restaurant in Minnesota.[53] For some inexplicable reason, Plaintiffs conclude that the "Internal Candidate" is really an "external" one, such that Plaintiffs should be entitled to somehow step ahead of them. Plaintiffs are, at the least mistaken.

There is no standing offer to MELTING POT franchise licensees that they accept a preemptive territory right over other existing or potential MELTING POT franchise licensees upon notification of interest in an open territory.[54] Even under Plaintiffs' deluded notion of TMPRI's notification practice, Plaintiffs are not entitled to step ahead of an "Internal Candidate" as is reflected on the "Approved Application Notification." Further yet, TMPRI *did* delay the Internal Candidate's application and approval process—once in September 2007 and again in February and March 2008.

Closely related, the Franchise License contains no "duty of good faith and fair dealing" that "imposes upon [TMPRI] any obligation to treat Plaintiffs in good faith and

---

[52] *Id.*

[53] *See* Compl. ¶¶ 56-57, 62.

[54] Sveum Aff. ¶ 13.

consistent with the reasonable standards of fair dealing in Plaintiffs' and [TMPRI]'s respective trade," and no such duty may be fairly implied. Rather, TMPRI has a duty to perform in good faith its obligations under the Franchise License—which contains absolutely no provision that permits New Grange to "expand" beyond its protected territory.[55] Notably, Plaintiffs do not even allege that TMPRI violated a specific contractual term, a requirement to state a breach claim under Minnesota law.

Finally, TMPRI did not engage in any business transaction or "dealings" with New Grange outside of the Franchise License, particularly where New Grange was treated unfavorably when compared to another existing MELTING POT® franchise licensee. TMPRI did not treat New Grange differently in terms of protected territory, royalties or franchise fees. TMPRI did not terminate, cancel, refuse to renew or to consent to transfer of New Grange's Franchise License. These are the "prohibited acts" of which Section 80C.14 speak, but Plaintiffs do not allege violation of those provisions.[56] And, of the "unfair and inequitable" acts the Commissioner has described under its rulemaking authority, Plaintiffs allude only to "unlawful discriminat[ion] between franchisees in any

---

[55] *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 960 (D. Minn. 2000) (Neither Minnesota nor Florida recognizes a cause of action for breach of the implied duty of good faith independently of a breach of express contract claim); *Todd County. v. Barlow Projects, Inc.*, Civ. Nos. 04-4128, 04-4220 ADM/RLE, 2005 U.S. Dist. LEXIS 8648, at *36 (D. Minn. May 11, 2005) (Minnesota courts narrowly interpret implied good faith covenant, limiting it to when one has an ulterior motive for fulfilling a condition precedent to a contract or a party does not use good faith in exercising an unlimited discretionary power provided in an express contract term), attached at Braunschweig Aff. Ex. 4.

[56] *See* Minn. Stat. §§ 80C.14(1)-(5).

business dealing" and "imposing a standard of conduct that is unreasonably.[57]

The "business dealings" of which Rule 2860.4400 speaks are in the nature of "charges offered or made for royalties, goods, services, equipment, rentals, advertising services"—not one-sided demands for rights outside of the franchise agreement, as Plaintiffs press here.[58] Notably, Rule 2860.4400 exempts "classification of or discrimination between franchisees" based on "reasonable grounds". But the true facts show, even under Plaintiffs' strained reading of the Rule, TMPRI treated Plaintiffs (although not franchisees) the same as, or better than, other MELTING POT® franchise licensees.

For example, TMPRI waited for Plaintiffs to make good on their stated desire for a new franchise license for almost 6 months. TMPRI guided New Grange as to how to improve operations, and developed an action plan, so that New Grange could reach Growth Reach Certification. TMPRI practically pleaded with Plaintiffs to provide the information necessary so that TMPRI could even begin its candidate review process, contacting Plaintiffs several times over several months to ask for that information. Then, after Plaintiffs finally managed to deliver the information requested (after their expansion request had been denied), TMPRI actually considered Plaintiffs' two applications. In the

---

[57] Compl. ¶ 76; Minn. R. 2860.4400 (2007).

[58] *Kieland v. Rocky Mountain Chocolate Factory, Inc.*, Civil No. 05-150 (DWF/SRN), 2006 WL 29990336 (D. Minn. Oct. 18, 2006) (rejecting franchisee's claim that franchisor's demand for payment of contractual fees from franchisee was discriminatory under Rule 2860.4400, when franchisor occasionally waived fees owed by some financially-troubled franchisees), attached at Braunschweig Aff. Ex. 5.

mean time, TMPRI put the Internal Candidate's legitimate application, done in accordance with TMPRI's established business practices, on hold.

In exchange, Plaintiffs refused to provide required information, said the information was "on its way", ignored TMPRI's established business practices, and waited until being denied before submitting competent information and an application. On top of all that, Plaintiffs then sued TMPRI in court, instead of submitting their purported claims to arbitration as they had promised.   As such, Plaintiffs have no legitimate claims against TMPRI, so they have no likelihood of success in arbitration.

### C.    The Extremely Tilted Balance of Harms.

Plaintiffs have not done equity, and certainly are not entitled to equity here. Plaintiffs manufacture contracts that do not exist, pretend "understandings" that no reasonable person could have, and feign irreparable injury, where they have actually sustained none.  In sharp contrast, TMPRI has done so much more than its Franchise License with New Grange requires.  Also in sharp contrast to Plaintiffs' irreparable injury pretense, is the actual, substantial harm that TMPRI has already suffered, and will continue to suffer if Plaintiffs are permitted to halt TMPRI's franchise licensing and restaurant opening operations in Minnesota.[59]

---

[59]   *Cordis Corp. v. Medtronic, Inc.*, Civil No. 4-86-820, 1986 U.S. Dist. LEXIS 17091(D. Minn. Dec. 1, 1986) ("If the grant of a preliminary injunction would cause defendant financial loss or damage to reputation which significantly outweighs any damage to the plaintiff, preliminary injunctive relief is not appropriate"), attached at Braunschweig Aff. Ex. 6.

If forced to stop all efforts to develop the Minneapolis/St. Paul market area, particularly when an existing franchise licensee has fully participated in TMPRI's selection and qualification process, TMPRI would certainly suffer enormous harm, including inestimable revenue loss.  For example, TMPRI will not be able to license the well-qualified Internal Candidate (or another qualified existing licensee) to operate a THE MELTING POT® restaurant in Minnesota, including the Woodbury Lakes location. At a minimum, TMPRI would lose its $35,000 initial franchise fee and royalties in excess of $90,000 per year for the next 10 years.  But TMPRI will also lose countless sales to customers that its franchise licensee cannot serve, and it will be deprived of the goodwill that accrues because of TMPRI's fine products and services.  Even a "temporary" injunction will threaten and likely cause precisely this harm as identified, qualified franchisees may invest elsewhere, a landlord may relet the intended restaurant space, and a competing restaurant could steal its way into this lucrative market.[60]

The harm an injunction would cause extends also to the Internal Candidate (or another qualified existing licensee) that intends to open THE MELTING POT® restaurants in Minnesota.   The Internal Candidate could not begin operations as a THE MELTING POT® restaurant which, on average, grosses $2.2 million per year.  They may not be able to secure a quality location, or to proceed with a quality build-out.  They may lose financing commitments at a time when the financial markets do not generously provide credit.  Similarly, the landlord could not begin to collect rent, at a time when

---

[60]   Sveum Aff. ¶43.

commercial vacancies across the United States are at an all time high.[61]

### D.      Policy Considerations.

The public interest is better served by enforcing written contracts according to their terms, permitting contracting parties certainty in their business transactions. There is no presumption of irreparable injury offered by the Minnesota Franchise Act here, because three Plaintiffs are not franchisees, and TMPRI has registered with the Commissioner of Commerce. These Plaintiffs are not entitled to any special protection as franchisees, because most are not franchisees and this case has absolutely nothing to do with the legitimate franchise relation proscribed by the Franchise License, and no franchisee stands to suffer any loss if no injunction is entered.

### III.      PLAINTIFFS SHOULD BE REQUIRED TO POST A BOND.

Rule 65(c), Federal Rules of Civil Procedure, and Eighth Circuit precedent requires Plaintiffs to post a substantial bond if they obtain injunctive relief here.[62] The Minnesota Franchise Act, § 80C.14(1), presumes to override the federal bond requirement. The Act, however, is permissive, and Plaintiffs have not demonstrated any violation of that Act. As such, the Court should hold Plaintiffs responsible, by requiring a substantial bond—for harm will certainly befall TMPRI if Plaintiffs are awarded injunctive relief.[63]

---

[61]   *Id.* ¶44.

[62]   *See Curtis 1000, Inc. v. Youngblade,* 878 F. Supp. 1224, 1279 (N.D. Iowa 1995).

[63]   Minn. Stat. §80C.14(1) (noting a temporary injunction *may* be granted under this section without requiring the posting of any bond or security).

## CONCLUSION

Based on the foregoing, Defendant The Melting Pot Restaurants, Inc. respectfully requests that the Court deny Plaintiffs' Motion for Temporary[sic] Injunction, enter an Order compelling arbitration and grant other such relief as the Court deems appropriate.

Dated:  April 28, 2008

By   s/ Sonya R. Braunschweig
Robert J. Pratte, Bar No. 8802X
Sonya R. Braunschweig, Bar No. 290282
DLA PIPER US LLP
90 South Seventh Street, Suite 5100
Minneapolis, Minnesota  55402
Telephone: 612.524.3000
Facsimile:  612.524.3001
robert.pratte@dlapiper.com
sonya.braunschweig@dlapiper.com

Christian C. Burden (admitted *pro hac vice*)
DLA Piper US LLP
101 East Kennedy Boulevard, Suite 2000
Tampa, Florida  33602
Telephone: 813.229.2111
Facsimile:  813.229.1447

Attorneys for Defendant The Melting Pot Restaurants, Inc.

CHGO1\31207631.1